UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JASPER LAMON ALLEN,

Plaintiff,

v.                                          Case No. 23-cv-1341-pp

CINDY GILBERT and REBECCA JONES,

Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 32, 38) AND DISMISSING CASE**

---

Plaintiff Jasper Allen, who is incarcerated and is representing himself, filed this civil rights case. The court screened the complaint and allowed the plaintiff to proceed on Eighth Amendment and Wisconsin state law negligence claims based on allegations that the defendants confined him in a cell with another person who had pneumonia, and the plaintiff contracted pneumonia. Dkt. No. 4 at 6-7. The defendants, who are represented by separate counsel, have filed motions for summary judgment. Dkt. Nos. 32, 38. This order grants the defendants' motions and dismisses the case.

I.      **Procedural History**

The plaintiff filed his complaint on October 10, 2023. Dkt. No. 1. On March 8, 2024, the defendants filed separate answers. Dkt. Nos. 14, 15.

On May 13, 2024, defendant Jones filed a motion for summary judgment on exhaustion grounds. Dkt. No. 19. The plaintiff responded, dkt. no. 24, and defendant Jones filed a reply in support of her motion, dkt. no. 25. On

1

December 3, 2024, the court denied Jones's motion for summary judgment on exhaustion grounds. Dkt. No. 48.

Meanwhile, on September 13, 2024, Jones had filed a second summary judgment motion, this time seeking judgment on the merits of the plaintiff's claim. Dkt. No. 32. Gilbert filed her merits-based summary judgment motion on September 27, 2024. Dkt. No. 38. The defendant timely responded to Gilbert's motion on October 16, 2024, dkt. no. 44; the court gave the plaintiff additional time to respond to Jones's motion, dkt. no. 50, and he timely filed his response materials on February 14, 2025, dkt. nos. 52-57. Both Gilbert and Jones filed reply briefs in support of their merits-based summary judgment motions. Dkt. Nos. 46, 58.

## II. Facts[1]

The plaintiff was incarcerated at Gordon Correctional Center during the events described in the complaint. Dkt. No. 34 at ¶1; Dkt. No. 40 at ¶1. Defendant Gilbert works at Gordon as a correctional sergeant. Dkt. No. 40 at ¶3. Defendant Jones, a registered nurse, worked for a healthcare staffing company on assignment at Gordon during the events described in the complaint. Dkt. No. 34 at ¶¶16, 18. The plaintiff alleges that after Gilbert moved him to a cell with an incarcerated person named Leon Prince and after Prince was diagnosed with pneumonia, Jones failed to move Prince into

_____

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

another cell or isolate him, which resulted in the plaintiff catching fungal pneumonia. Dkt. No. 34 at ¶4; Dkt. No. 40 at ¶4.

Gordon is a minimum-security facility in the Wisconsin Correctional Center System, an "institution" comprised of fourteen adult, male correctional centers with the purpose of preparing incarcerated individuals to reintegrate into the community. Dkt. No. 40 at ¶5. Gordon offers work release programs with local employers through which employment is provided to qualified incarcerated persons. Id. at ¶6. The facility has twenty-nine rooms total, with two, three, four, six and twelve-person rooms. Id. at ¶7. Each room has its own key and lock to which the incarcerated individuals have access, and movement within the institution generally is free from restraint or supervision. Id. at ¶9.

Gordon has a capacity of 100 individuals. Dkt. No. 40 at ¶10. There are typically two sergeants on duty during a shift, along with additional staff such as a captain, superintendent, food service staff, financial specialist, psychologist and others. Id. The facility also has a Health Services Unit ("HSU") which is staffed with a nurse Monday through Friday. Id. at ¶11. There is no physician on staff at Gordon. Id. The HSU is not staffed during the weekends. Id. at ¶12. If an incarcerated individual has a medical concern during the weekend, nursing staff are on call to assess the individual. Id. If the individual's condition requires further care than what the nurse can provide, he is sent offsite for treatment at a local medical facility. Id.

When an incarcerated person first arrives at Gordon, he typically is placed in a larger capacity room, until other rooms become available through

individuals moving to different facilities or being released from custody. Dkt. Id. at ¶13. The general preference for incarcerated individuals is to be housed in the smaller capacity rooms. Id. at ¶14. Incarcerated individuals on work-release generally more frequently are offered housing in the two-man rooms because they are paying for room and board, and these rooms can be better suited for an individual with a typical work schedule. Id. at ¶15.

Sergeant Gilbert is responsible for room reassignments at Gordon. Id. at ¶17. If an incarcerated individual wants to be reassigned to a different room, he must write an Interview/Information Request form to Gilbert's attention with the request. Id. at ¶18. Gilbert keeps a binder of all requests she receives for room reassignments, and when a bed in a room becomes available, she goes down the list of requests to find out who is next in line for a room reassignment. Id. at ¶19. Incarcerated persons are moved based on availability and when their request was submitted. Id. at ¶20. When an incarcerated individual is offered a room assignment, he can accept or decline the new room. Id. at ¶21. If there is a medical reason for an incarcerated individual to change rooms, that decision is made by a medical professional. Id. at ¶26. Gilbert is not a medical professional, so she does not evaluate an incarcerated person's health condition and decide to isolate him based on her own judgment. Id. at ¶27.

On January 28, 2023, Gilbert wrote an incident report after she learned that Prince was looking for a sergeant because he was not feeling well. Id. at ¶32. Gilbert informed another sergeant who then contacted HSU. Id. at ¶33.

Prince later was sent offsite to the emergency room. Id. Gilbert did not interact with Prince any further that day. Id. at ¶34. She did not transport Prince to the hospital, and she was not onsite when he arrived back at the facility after his visit. Id. She did not review his medical records, and did not know whether Prince was or was not diagnosed with any illnesses at that time. Id. It is not uncommon for individuals confined at Gordon to be sent to the emergency room, because the facility does not have a physician on site. Id. at ¶35. If an incarcerated individual's condition is beyond what the nursing staff can treat onsite, the standard response is to send him off grounds for further evaluation and treatment. Id.

When Prince returned from the hospital on January 28, 2023, Nurse Jones did not receive any instruction or communication from the hospital, indicating that (1) he had a communicable condition, (2) he was to be isolated, or (3) others should be isolated from him. Dkt. No. 34 at ¶29. Prince continued to eat and mingle with other incarcerated individuals. Id. at ¶41. In doing so, he came into contact with other incarcerated persons and staff. Id. at ¶42.

Also on January 28, 2023, Gilbert reassigned the plaintiff to a new room. Dkt. No. 40 at ¶37. The plaintiff had been next in line to change rooms; Gilbert asked him if he would like to change rooms and he answered in the affirmative. Id. The room to which the plaintiff voluntarily moved was a three-man room. Id. at ¶38. Prince was housed in the room, and Prince's prior roommate had been moved out of the room because he and Prince were not getting along. Id. at ¶39. Prince's former roommate never developed an illness. Id. Gilbert was

not aware of Prince's medical condition at the time of the room reassignment. Id. at ¶41. Gilbert was not aware of the plaintiff's alleged medical conditions, and she never had transported him to and from the hospital at any point. Id. at ¶42. The plaintiff did not request a room change from Gilbert based on allegations that his roommate was ill, nor did he communicate his concerns to her. Id. at ¶43.

On February 6, 2023—about a week after he moved into the new room—the plaintiff visited the HSU, complaining of respiratory symptoms, congestion and a cough. Dkt. No. 34 at ¶43. The plaintiff did not have a fever upon presentation. Id. at ¶44. Jones administered a COVID test and a strep test, both of which came back negative. Id. Jones called Dr. Liu, a Department of Corrections doctor, and received permission to send the plaintiff to the emergency room. Id. at ¶45. After the plaintiff was transported to Spooner Health, Jones called and informed the nurse manager there of the plaintiff's symptoms. Id. at ¶46. She discussed the negative COVID result, and the fact that this was the second recent patient with respiratory symptoms; she asked about possible non-COVID illnesses that can present similarly. Id. Dr. Spinetta of Spooner Health remarked that the plaintiff's and the previous patient's symptoms could not be related, given their symptoms and the overall health of the Gordon population. Id. at ¶47.

When Jones saw the plaintiff in the HSU on February 6, 2023, she learned that he had been cellmates with Prince. Dkt. No. 34 at ¶48. Before the plaintiff went to Spooner Health on February 6, 2023, he interacted with others

at Gordon. Id. at ¶49. During Jones's time at Gordon, Prince and the plaintiff were the only two persons at the facility who were diagnosed with fungal pneumonia. Id. at ¶50.

At Gordon, Jones's direct supervisor was Holly Gunderson, the director of nursing. Dkt. No. 34 at ¶19. When Jones had medical questions or needed permission to take certain medically related actions, she had to obtain permission from Gunderson or Dr. Liu. Id. at ¶20. Jones did not have the ability to diagnose medical conditions; she had to rely on diagnoses made by medical doctors and follow physicians' orders. Id. at ¶21. When an incarcerated individual went to the hospital from Gordon when Jones was not at the facility, she often would be informed that the individual had been transported to the hospital or of his diagnosis on his return. Id. at ¶25. When an incarcerated person returned from the hospital, Jones often would receive an aftercare summary from the hospital indicating the reason for the emergency visit, tests performed, the diagnosis and physician orders to be implemented for follow-up discharge care. Id. at ¶26.

A registered nurse does not have the authority to write orders to isolate or to implement isolation of an incarcerated individual without a doctor's order and security coordination within the facility. Dkt. No. 34 at ¶30. A doctor needs to issue isolation orders with a diagnostic reason for the isolation. Id. When Jones worked at Gordon, if there were discharge orders from an emergency room doctor during her off-hours, the accompanying guard would bring a written after-care summary back with the incarcerated person and read it over

7

the phone to an on-call nurse and then put the after-care summary in her mailbox. Id. at ¶31. The on-call nurse would then call the captain or the superintendent and tell them if something was needed for the incarcerated person. Id.

If Prince were to be isolated when he returned from the hospital on January 28, 2023, an order that he be isolated would have had to come from the emergency room doctor. Dkt. No. 34 at ¶33. That did not occur. Id. Jones did not have the authority to order Prince to be isolated or to order his cellmate to be moved out of the shared cell. Id. at ¶34. Jones had no reason to believe that Prince needed to be isolated or that not isolating him put others at the correctional facility at risk. Id. When Prince returned from the hospital, he returned to the general population at Gordon which put him in contact with numerous other individuals. Id. at ¶36.

There are several types, and levels of severity, of pneumonia. Dkt. No. 34 at ¶38. Not all are caused by the same pathogen, not all are severe and not all require isolation. Id. Respiratory fungal pneumonia is not communicable. Id. at ¶39. In other words, it is not spread from person to person. Id. The plaintiff would not have caught fungal pneumonia simply from being in the same cell with Prince. Id. at ¶40.

After the plaintiff went to the hospital, a multidisciplinary panel from the Department of Corrections medical and nursing staff, Gordon Superintendent Grant Berg, the public health department and several other health experts decided that Gordon would implement precautionary measures for a short

8

period of time until tuberculosis (TB) culture results for Prince were returned. Dkt. No. 34 at ¶53. There was a concern that a slight possibility existed that Prince might have TB. Id. at ¶54. The precautionary measures remained in place until after the TB cultures for Prince came back negative. Id. at ¶55. Prince and the plaintiff received many tests to rule out other respiratory causes, which is standard practice when patients are not responding to antibiotic therapy. Id. at ¶56. The precautionary measures taken until Prince's TB cultures came back negative consisted of staff and incarcerated individuals taking extra measures to wear masks and wash hands more frequently, and the facility increased disinfection efforts. Id. at ¶57.

After Prince and the plaintiff went to the hospital, Jones was part of several discussions and a Zoom meeting with the superintendent, captain, doctor, Director of Nursing Gunderson and others, trying to determine if there was anything further Gordon should be doing to maintain the health and safety of staff and incarcerated persons. Dkt. No. 34 at ¶58. This panel tried to identify the environmental source of Prince's and the plaintiff's infections. Id. at ¶59. The facility, grounds and off-site work locations were inspected, Id.

A few months after the plaintiff moved into the room with Prince, Gilbert was contacted by an institution complaint examiner and informed that the plaintiff had filed an inmate complaint alleging that she had placed him in a room with a sick individual. Dkt. No. 40 at ¶44. There were no known repercussions throughout the institution from any illnesses which Prince or the plaintiff contracted. Id. at ¶45. The facility still was under quarantine

9

procedures due to the COVID-19 pandemic, which involved utilizing masks, practicing social distancing and limiting movement within the institution. Id. When investigating the plaintiff's inmate complaint, Superintendent Berg wrote, "Prince did go to the hospital after [the plaintiff] was in the room. When Prince was released from ER, to my knowledge the hospital never indicated that he needed to be isolated. Had the hospital indicated that Prince needed to be isolated we would have followed doctors' directions." Dkt. No. 34 at ¶14. Berg went on to state that Prince eventually was diagnosed with blastomycosis.[2] Id. Berg also commented that "blastomycosis is not spread from person to person" and that Prince had been working on a bridge and the nearby Namekegon River also reportedly was a source of blastomycosis. Id. at ¶15.

On September 1, 2023, the plaintiff signed and had a Notice of Claim form notarized. Dkt. No. 34 at ¶60. The form was mailed on September 5, 2023 and received by the Wisconsin Attorney General on September 15, 2023. Id. at ¶61; Dkt. No. 40 at ¶46.

## III. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

[2] "Blastomycosis is an infection you get from the fungus Blastomyces. Blastomyces lives in moist soil in parts of North America. It's too small to see, so you can breathe it into your lungs without knowing it. There, it can grow and make you sick. It sometimes spreads to your skin or other parts of your body." my.clevelandclinic.org/health/diseases/blastomycosis (last visited August 26, 2025).

judgment as a matter of law." Federal Rule of Civil Procedure 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986); <u>Ames v. Home Depot U.S.A., Inc.</u>, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." <u>See</u> <u>Anderson</u>, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    <u>Discussion</u>

Jones contends that the court should grant her motion for summary judgment because the plaintiff did not have a serious medical need. Dkt. No. 33. According to Jones, the plaintiff cannot establish the objective element of an Eighth Amendment claim because the fungal infection he says he caught

11

from Prince is not communicable so the plaintiff could not have caught it from Prince. Id. at 8-9. Jones also contends that she was not deliberately indifferent to a serious medical need because she had no reason to believe that there was a serious risk, and because she responded reasonably to the facts of which she was aware at the time. Id. at 9-11. Jones contends that the plaintiff cannot prove that she caused him an injury or serious risk of an injury, and that she is entitled to qualified immunity on the plaintiff's Eighth Amendment claim. Id. at 11-12. Finally, she asserts that the plaintiff cannot maintain a negligence claim because he did not timely file his notice of claim, Jones did not breach the applicable standard of care and the plaintiff does not have an expert to establish that she did. Id. at 13-16.

Gilbert contends that plaintiff's deliberate indifference claim against her fails because he cannot demonstrate that she was aware of and disregarded a serious risk to his health or safety. Dkt. No. 39 at 9-11. Gilbert also contends that the plaintiff cannot demonstrate housing him in the same room with Prince created a serious risk to the plaintiff's health or safety. Id. at 11-12. Gilbert maintains that she is entitled to qualified immunity. Id. at 12-14. She further asserts that plaintiff's state law claim is barred by his failure to file a timely notice of claim. Id. at 14-16.

The plaintiff filed a combined response to the defendants' motions for summary judgment in which he disagrees with their arguments in support of summary judgment. Dkt. No. 44. This response consists of an unverified, four-page brief. Id. According to the plaintiff, Gilbert knew that Prince was sick and

needed to go to the hospital, and that he had not been going to work. Id. at 1. The plaintiff also states that Jones knew Prince had pneumonia when he returned from the hospital and that, as a nurse, she knows pneumonia is contagious, but she still did not move the plaintiff from the room. Id. The plaintiff states that it is not true that fungal pneumonia cannot be passed from person to person, because he caught it from Prince. Id. at 2. He also states that he filed his notice of claim late because he did not learn that he needed to file one until August or September. Id. at 3-4.

The plaintiff asked the court to give him additional time to respond to Jones's motion for summary judgment. Dkt. No. 49. The court granted that request. Dkt. No. 50. The plaintiff then filed a three-page response, dkt. no. 53, a brief in opposition, dkt. no. 54, a response to Jones's proposed findings of fact, dkt. no. 52, his own proposed findings of fact, dkt. no. 55, and two declarations, dkt. nos. 56, 57. In his response, the plaintiff asserts that "Nurse Jones knew Leon Prince [his] cellmate was diagnosed with community acquired pneumonia on Jan 28th 2023 and didn't put a [sic] order in to have him isolated." Dkt. No. 53 at 1. The plaintiff asserts that Jones was negligent because she breached her duty to care for him when she didn't isolate Prince, which resulted in the plaintiff catching fungal pneumonia. Id. at 2; Dkt. No. 54 at 4-6. The plaintiff acknowledges that fungal pneumonia cannot be spread from person to person via contact, but he says that if a person has a severe case of fungus in his lungs and is constantly coughing the fungal spores/yeast out of their lungs into the air for someone to inhale, then it becomes

13

contagious, especially if the immune system cannot fight off the fungus. Dkt. No. 54 at 6-7. The plaintiff contends that Jones is not entitled to qualified immunity. Id. at 7-9. He asserts that the court should not dismiss his negligence claim due to the fact that he does not have expert testimony (he says he has limited resources due to being in prison), id. at 9-10, and that he was not required to file a notice of claim because he filed this case in federal, not state, court, id. at 8. The plaintiff further contends that his negligence claim survives on the merits. Id. at 9-10. And he says that Jones's alleged negligence caused actual damages because he was hospitalized for sixteen days, had to take fungal antibiotics for nine months, had liver damage from the antibiotics and suffered life-long lung scarring. Id. at 10.

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). To demonstrate a violation of the Eighth Amendment, an incarcerated individual must make two showings. "First, the deprivation alleged must be, objectively, sufficiently serious." Id. at 834 (quotations omitted). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Id. The second requirement is that the prison official was deliberately indifferent "to inmate health or safety," id., meaning that he was

both aware of and disregarded "an excessive risk to inmate health or safety," id. at 837.v

It is undisputed that on January 28, 2023, Gilbert authorized the plaintiff's transfer into a room with Prince. That same day, Gilbert received a request for medical attention from Prince and approved his visit to the hospital. It is not uncommon for incarcerated individuals at Gordon to be sent to the hospital because Gordon does not have a physician onsite. When Prince returned later that day, he returned to his room. Gilbert did not know the outcome of Prince's hospital visit. Prince did not return from the hospital with an order to isolate. If he had, Jones would have followed those orders and requested of her supervisors that Prince be isolated. On February 6, 2023 (eight days after his room transfer), the plaintiff visited the HSU with respiratory symptoms and Jones requested that he be sent to the hospital. The plaintiff later was diagnosed with fungal pneumonia. He did not contract this from Prince because fungal pneumonia is noncommunicable.

The plaintiff insists that he *did* contract fungal pneumonia from Prince, and he submitted documents that he says support his assertion. But the documents that the plaintiff submitted are not authenticated and, even if they were, they do not support his position. See Dkt. No. 52-1.[3] The plaintiff cannot

---

[3] The plaintiff submitted pages from something called The Family Medical Guide that discussed how colds spread, how inhaling spores in soil can cause fungal respiratory infections and how those infections might be treated. Dkt. No. 52-1 at 1-3. He submitted an AI "overview" from an unidentified source stating that "in certain situations, someone with a fungal lung infection can cough up fungal spores or yeast cells that can then be released into the air, potentially allowing others to inhale them, although this is not a typical way for fungal

establish that the defendants disregarded a known risk of harm to the plaintiff because the facts do not support a finding that being housed in a room with Prince placed the plaintiff at a substantial risk of harm. Even if the plaintiff could satisfy the objective prong of an Eighth Amendment claim, he has not established that the defendants acted with deliberate indifference.

Prison officials are deliberately indifferent when they know of and disregard a substantial risk to an incarcerated individual's health. Riley v. Waterman, 126 F.4th 1287. 1295 (7th Cir. 2025) (citing Farmer, 511 U.S. at 837). For a prison official's acts or omissions to constitute deliberate indifference, the plaintiff does not need to show that the official intended harm or believed that it would occur. Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (citing Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996)). But "mere negligence is not enough." Id. (citing Estelle, 429 U.S. at 106). A plaintiff "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." Id. (citing Farmer, 511 U.S. at 837); see also Brown v. Osmundson, 38 F.4th 545, 550 (7th Cir. 2022). "Officials can avoid liability by proving they were unaware of an obvious risk to inmate health or safety." Id. (citing Farmer, 511 U.S. at 844).

The plaintiff has provided no evidence showing that the defendants had information that Prince's medical condition amounted to a risk of harm to the

---

infections to spread and is usually only a concern for people with severely compromised immune systems or large fungal burdens in their lungs." Id. at 4. He also submitted his admission records to Spooner with notes showing that he "appeared" to have community-acquired pneumonia." Id. at 6-7.

plaintiff. Although Gilbert knew that Prince was sick and recommended that he go to the hospital the same day the plaintiff moved into Prince's room, the plaintiff has identified no evidence showing that Gilbert had any reason to believe that Prince's medical condition was a risk to the plaintiff. Gilbert did not know that Prince or the plaintiff had been diagnosed with fungal pneumonia. Even if she had, the plaintiff has presented no evidence (other than an artificial intelligence "overview" from an unidentified source) that fungal pneumonia is communicable. A reasonable factfinder could not conclude that Gilbert's act of moving the plaintiff into a room with Prince amounted to deliberate indifference. Likewise, the plaintiff has presented no evidence showing that Jones had reason to believe that Prince being housed with the plaintiff presented a serious risk. When Prince returned from the hospital on January 28, 2023, he did not return with orders to isolate, and he continued to interact with other people at Gordon. Jones did not have the authority to isolate Prince, and she had no reason to ask a supervisor to do so. Jones's failure to isolate Prince when he returned from the hospital did not amount to deliberate indifference. A reasonable factfinder could not conclude that Gilbert or Jones violated the plaintiff's constitutional rights, and the court will grant their motions for summary judgment on his Eighth Amendment claim.[4]

_____

[4] Because the court has granted summary judgment on the merits of the plaintiff's Eighth Amendment claim, it will not address the defendants' arguments that they are entitled to qualified immunity.

Turning to the plaintiff's state law negligence claim, it is undisputed that the plaintiff did not submit his notice of claim within 120 days of the incident. Under Wisconsin state law, to commence an action against a state officer, employee or agent a plaintiff must file a notice of claim with the Attorney General:

> Except as provided in sub. (5m), no civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employee's or agent's duties, . . . unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employee or agent involved.

Wis. Stat. §893.82(3).

The events giving rise to the plaintiff's claim occurred between January 28 and February 6, 2023. The 120-day deadline was June 6, 2023, and the plaintiff mailed his notice of claim on September 5, 2023, almost three months past that deadline. "Where the plaintiff has failed to comply with this notice of claim statute, the court lacks jurisdiction to hear the claim." Williams v. Nelson, 398 F. Supp. 2d 977, 992 (W.D. Wis. 2005) (quoting Saldivar v. Cadena, 622 F. Supp. 949, 959 (W.D. Wis. 1985)). That is true regardless of whether the plaintiff brings the claim in state or federal court. The plaintiff's notice of claim was untimely regarding his claim against Gilbert, and the court will grant Gilbert's motion for summary judgment as to the plaintiff's state law claim.

But "claims against nurses regarding medical acts or decisions are exempt from the notice of claim requirements under §893.82(5m)." Sierra-Lopez v. Syed, Case No. 17-cv-599, 2023 WL 4685825, at *2 (W.D. Wis. July 21, 2023) (citing Soderlin v. Doehling, No. 18-CV-899, 2021 WL 4742716, at *2 (W.D. Wis. Oct. 12, 2021), aff'd, No. 22-2045, 2023 WL 2399383 (7th Cir. Mar. 8, 2023)). Because Jones is a nurse, the plaintiff's failure to timely submit a notice of claim does not require dismissal of his medical negligence claim against her. Nonetheless, the plaintiff's state law claim against Jones fails because he did not identify an expert.

Wisconsin law defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." Sawyer v. Midelfort, 227 Wis. 2d 124, 149 (Wis. 1999); Schuster v. Altenberg, 144 Wis. 2d 223, 229 (Wis. 1988). Like all claims for negligence, a claim for medical malpractice includes the following four elements: (1) a breach of (2) a duty owed (3) that results (4) harm to the plaintiff. Paul v. Skemp, 242 Wis. 2d 507 (Wis. 2001). The general rule is that expert testimony is required to establish the standard of care in a medical negligence case. Gil v. Reed, 535 F.3d 551, 557–58 (7th Cir. 2008). That said, where common knowledge would allow a jury to find negligence, there is an exception to the rule. Stinson v. Rothbauer, Case No. 20-CV-762, 2022 WL 2643515, at *5 (W.D. Wis. July 8, 2022) (citing Jones v. Edge, Case No. 16-cv-848, 2018 WL 2301846, at *4 (W.D. Wis. May 21, 2018)); see also Anderson v.

Schroeder, Case No. 16-C-1543, 2018 WL 3130644, at *7 (E.D. Wis. June 26, 2018)).

The plaintiff has not named a medical expert. The plaintiff asserts that this is because he is in prison and has limited resources. But he did not ask this court to appoint a medical expert (which he could have done). He also asserts that Dr. Spinetta told him that every time Prince coughed, the spores went into the air and stayed there for hours, and that the plaintiff inhaled them and got sick. Dkt. No. 54 at 9. But the medical records the plaintiff provided (Dkt. No. 52-1 at 5-7) do not say that. The plaintiff's declarations do not say that. The plaintiff did not provide an affidavit/declaration from Dr. Spinetta. The plaintiff claims that Jones should have known to isolate Prince when Prince returned from the hospital because, as a nurse, she should have known that Prince's pneumonia was contagious. Although the plaintiff acknowledges that fungal pneumonia is generally not contagious, he says that he is proof that it can be contagious because he caught it from Prince. The plaintiff then asserts that Prince coughed up fungal spores from which the plaintiff must have contracted his fungal pneumonia (a similar description to that provided by the "AI Overview" he attached at Dkt. No. 52-1). The plaintiff's theory of the communicability of fungal pneumonia is not common knowledge, which means that he needs an expert to prove his medical negligence claim. See Christianson v. Downs, 90 Wis. 2d 332 (Wis. 1979) (unless the situation is one where the common knowledge of laymen affords a basis for finding negligence, expert medical testimony is required to establish the degree of care and skill

required of a medical care provider). Because he did not name an expert and has provided no expert testimony supporting his theory of transmission, the court must dismiss the plaintiff's negligence claim against Jones.

## IV. Conclusion

The court **GRANTS** defendant Jones's motion for summary judgment. Dkt. No. 32.

The court **GRANTS** defendant Gilbert's motion for summary judgment. Dkt. No. 38.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the

full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 26th day of August, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

22